UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                      CRIM. NO. 15-20769

       v.                               HON. TERRENCE G. BERG

JAMES C. DUKES,

       Defendant.
_____/

**OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION TO SUPPRESS (DKT. 13)**

Defendant James C. Dukes ("Defendant") moves to suppress a firearm seized from him during a traffic stop on November 16, 2015. (Dkt. 13). Defendant has been charged with being a felon in possession of a firearm (Dkt. 1; Indictment). The firearm in question – a Smith & Wesson M&P, 9 millimeter, semi-automatic pistol, serial number HVV9806 – was taken from Defendant's pants pocket by the Michigan State Police after the car in which Defendant was traveling was stopped. Defendant challenges the legality of the traffic stop. The Government filed a brief in opposition (Dkt. 17), and the Court held an evidentiary hearing on June 7, 2016. After the hearing, both parties filed supplemental briefing (Dkts. 20 & 21).

Having considered the arguments advanced by the parties, and the testimony of the witnesses, the Court will **DENY** Defendant's motion to suppress for the reasons set forth below.

**FINDINGS OF FACT**

At the evidentiary hearing, the government presented the testimony of two witnesses, Michigan State Police Troopers Thomas Pinkerton and Derek Hoffman, and offered one exhibit: a video recording from the patrol car's dash camera (Ex. 1). Defendant presented the testimony of one witness, Defendant's wife, Lativia Trice, and offered five photographic exhibits, depicting: a vehicle's VIN number plate (Ex. A), a rear view of a dark green Pontiac Grand Prix without a license plate attached to it (Ex. B), an unlatched seat belt (Ex. C), a seat belt receiver (Ex. D), and a close-up of a lit rear license plate light on a dark green Pontiac Grand Prix (Rx. E).

The circumstances leading to Defendant's arrest are as follows. On November 16, 2015 at approximately 8:00 p.m., Lativia Trice was driving a dark green Pontiac Grand Prix when she was stopped by the Michigan State Police near the intersection of Myrtle Avenue and Fleming Road in Flint, Michigan. Troopers Thomas Pinkerton and Derek Hoffman were on road patrol in a marked car at the time when they observed Ms. Trice drive by, travelling southbound on Fleming Road. As Ms. Trice passed in front of the patrol car, both troopers testified that they observed that she was not wearing her seatbelt, a civil infraction in violation of Mich. Comp. Laws § 257.710e(3), which requires drivers of motor vehicles to wear their seatbelt while driving. Ms. Trice testified that she was wearing her seat belt that night, that she always wears her seat belt, and that she is certain that she was wearing it that night because she was four months pregnant at the time. On cross-examination, however, Ms. Trice acknowledged that had she not been wearing her

seat belt, she would have had the opportunity to fasten it between the time that the patrol car pulled behind her and the time that she pulled over. The dash cam video presented by the government shows a dark green Pontiac Grand Prix quickly passing in front of the patrol car, but the driver is not visible and it is not possible to ascertain from the video whether Ms. Trice was wearing her seat belt or not.

After seeing the vehicle pass by, the troopers pulled behind it, followed, and observed that the car did not have a license plate affixed to the rear bumper, a potential violation of Mich. Comp. Laws § 257.225. The troopers both testified that they could not see any license plate on the vehicle. They followed the vehicle as it turned left, and began travelling east-bound onto Sunny Street. Trooper Pinkerton activated his overhead lights to initiate a traffic stop, and also shone the patrol car's side mounted spot light onto the rear of the Grand Prix. Ms. Trice immediately pulled over to the side of the road and stopped her vehicle. After illuminating the car with the spotlight, the troopers testified that they could then see a temporary paper registration plate taped in the lower left-hand corner of the car's rear window. Written in thick black ink on the paper plate was an expiration date of "11-18-2015." Thus, the temporary paper license plate was valid on the date of the stop (November 16, 2015).

The troopers approached the car and spoke with four occupants. Trooper Pinkerton spoke to Ms. Trice – the driver – while Trooper Hoffman watched the passengers, including Defendant, who was seated in the front passenger seat. Trooper Pinkerton asked for Ms. Trice's driver's license and asked "What's going on

with the car? No plates…." (Ex. 1, Dash Cam Video at 54 seconds). Ms. Trice then stated that she "lost the title and was trying to get the title back." *Id.* at 58 seconds. Trooper Pinkerton then asked Ms. Trice whether there was anything in the car that should not be (*id.* at 1 minute, 24 seconds), and Ms. Trice said that she had "a bag of weed" in her pocket.

Trooper Hoffman testified that he shined his flashlight into the vehicle and spotted an empty pistol holster on the front passenger floor board, near where Defendant was sitting. *Id.* at 1 minute, 30 seconds. Trooper Hoffman then drew his firearm (*id.* at 1 minute, 32 seconds) and asked whether anyone in the car had a weapon. Defendant stated that he had a gun in his pants pocket. Trooper Pinkerton walked around from where he was standing near the driver's side of the car to the passenger's side of the car, and removed the gun from Defendant's right from pants pocket. *Id.* at 2 minutes, 10 seconds. After removing the gun, Trooper Pinkerton removed Defendant from the car and placed him in handcuffs. *Id.* at 2 minutes, 20 seconds; Dkt. 13, Ex. 1, Police Report.

At 4 minutes and 54 seconds of the dash cam video Trooper Pinkerton can be seen reaching into the stopped car and disconnecting the seat belt of the driver, Ms. Trice, before escorting her out of the vehicle. From the video evidence, it appears that, at least at that point in time, Ms. Trice had her seat belt buckled.

Defendant was ultimately arrested for being a felon in possession of a firearm. Ms. Trice was not issued any traffic citations, nor was she arrested for

4

marijuana possession, and she was permitted to drive away. The entire stop lasted approximately seventeen minutes.

Defendant filed a motion to suppress (Dkt. 13) challenging the legality of the car stop. Defendant's main contentions are that: (1) There was no probable cause to stop Ms. Trice for the infraction of not wearing her seat belt because she was in fact wearing her seat belt; and (2) There was no probable cause or reasonable suspicion to stop Ms. Trice for the infraction of driving without a license plate because the car had a legally valid temporary registration plate. Defendant's motion does not challenge the specific seizure of the gun from Defendant. Defendant only challenges the legality of the traffic stop.

## ANALYSIS

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment." *Brendlin v. California*, 551 U.S. 249, 251, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007). Not only the driver of a stopped vehicle, but a passenger as well, is seized within the meaning of the Fourth Amendment and thus may challenge the legality of the stop. *See Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007). Consequently, "[i]f either the stopping of

5

the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit'" *Id*. at 2408 (internal quotation omitted).

A police officer lawfully may stop a car when he or she has probable cause to believe that a civil traffic violation has occurred, or reasonable suspicion of an ongoing crime. *See United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) ("[T]here is nothing unreasonable about stopping a vehicle whose driver has just committed a traffic violation.") (citing *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). The fact that a traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle. *Street*, 614 F.3d at 232 (upholding the legality of a traffic stop made for a seatbelt violation); *United States v. Anderson*, 458 Fed. App'x. 440, 442 (6th Cir. 2012) (holding that a license-plate violation provided probable cause to make a traffic stop). "[E]ven if [the] decision to stop [a vehicle] for a traffic violation was a pretext to fish for evidence of other crimes," this does not support the conclusion that the traffic stop was invalid at its outset. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). In other words, so long as there is an articulable legal basis for the stop, "the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop." *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008); *see United States v. Garrido*, 467 F.3d 971, 978 (6th Cir. 2006) (citation

omitted) ("'A police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct'").

### A) The Stop for the Seat Belt Violation

Mich. Comp. Law § 257.710e(3) states that "[e]ach operator and front seat passenger of a motor vehicle operated on a street or highway in this state shall wear a properly adjusted and fastened safety belt . . ." Violation of this statute constitutes a civil infraction. *See* Mich. Comp. Laws § 257.710e(8). Here, both troopers testified that they saw Ms. Trice driving without wearing a seatbelt. Both troopers testified that, although it was nighttime, the intersection was well-lit by overhead street lights and by the patrol car's headlights. The dash cam video depicts the intersection as well-lit. While Ms. Trice testified that she was wearing her seatbelt at the time she passed in front of the troopers, she also acknowledged that she would have had the opportunity to fasten her seatbelt before she pulled over, had she not been wearing it. On balance, the Court finds no basis to question the credibility of the troopers who testified. Cross examination did not reveal any inconsistencies in their testimony. Although it does appear in the video from the dash cam, as defense counsel argues, that it was necessary to disengage Ms. Trice's seat belt before she got out of the car, this fact alone does not establish that she was wearing her seat belt at the time the car was first seen by the officers. While the Court assigns some weight to this fact in evaluating the credibility of the Troopers' testimony, it does not directly contradict their testimony and is therefore

7

insufficient to impeach or discredit them. Although Defendant argues that the Court need not find the officers were not credible in order to find that there was insufficient probable cause, the Court disagrees. Even if the officers were mistaken in what they saw, if there is no basis to disbelieve their sworn testimony that they saw that Ms. Trice had no seat belt on when she drove by, they had probable cause to make the stop. Based on the testimony and evidence presented at the hearing, and the Court's judgment of the credibility of the witnesses, the Court concludes that the State Troopers lawfully stopped the car Defendant occupied based on their observation of a seatbelt violation. *See United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010).

### B) The Stop for a Possible License Plate Violation

The Court also finds that a temporary investigative stop was reasonable under the Fourth Amendment to investigate a potential license plate violation. After pulling behind Ms. Trice's vehicle, both troopers testified that they could not see any license plate on it. Mich. Comp. Law § 257.50 defines "registration" as "a registration certificate, plate, adhesive tab, or other indicator of registration issued under this act for display on a vehicle." Although "plate" is undefined in the Motor Vehicle Code, it includes the paper registrations given for temporary purposes as "plates," despite their paper composition. *See* Mich. Comp. Law § 257.226a. Mich. Comp. Law § 257.225 sets forth how registration plates must be displayed:

> (1) Except as otherwise provided in this subsection and subsection (6), a registration plate issued for a vehicle shall be attached to the rear of the

vehicle. A registration plate issued for a truck tractor or road tractor shall be attached to the front of the vehicle.

(2) A registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which the plate is issued so as to prevent the plate from swinging. The plate shall be attached at a height of not less than 12 inches from the ground, measured from the bottom of the plate, in a place and position that is clearly visible. The plate shall be maintained free from foreign materials that obscure or partially obscure the registration information and in a clearly legible condition.

* * *

(7) A person who violates this section is responsible for a civil infraction.

Mich. Comp. Law § 257.686(2) requires that the registration plate shall be illuminated:

Either a tail lamp or a separate lamp shall be constructed and placed so as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. A tail lamp or tail lamps, together with any separate lamp for illuminating the rear registration plate, shall be wired so as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

Michigan's Motor Vehicle Code does not contain a specific provision concerning where temporary registration plates are to be affixed that would control over the general provisions of Mich. Comp. Law § 257.225 and Mich. Comp. Law § 257.686(2). However, Michigan courts interpreting these statutes have held that their plain language does not exclude temporary registration plates from the illumination and visibility requirements governing registration plates generally. *See People v. Stanley*, No. 319229, 2015 WL 1314665, at *2 (Mich. Ct. App. Mar. 24, 2015) appeal denied, 498 Mich. 886, 869 N.W.2d 606 (2015) ("[T]he plain language of MCL 257.686(2) and MCL 257.225 does not exclude temporary registration plates

9

from the illumination and visibility requirements governing registration plates generally.") There is no reason to consider the quoted statement to be dicta, as Defendant argues. Indeed, the *Stanley* court pointed out that the key factor in that case, as it is here, was not whether the temporary tag was illuminated, but whether the officer was justified in making the stop because no temporary plate could be seen at all. The *Stanley* court pointed out: "However, *even if temporary registration plates need not be illuminated, the record reflects that the officer did not see any registration plate when he made the stop.*" *Id.* (emphasis added).

The Court recognizes practical difficulties of requiring drivers to illuminate temporary paper registration plates that are designed to be adhered inside a car's rear window. It would seem difficult, at best, to arrange lighting directed toward one area of a vehicle's rear window. However, as in *Stanley*, both troopers in this case testified that they could not see *any* registration plate on Ms. Trice's car until after they pulled her over. From the Court's view of the dash cam video, this testimony is bolstered: on the video, no temporary tag is visible in the back window of the vehicle until after it is being parked, and the spot light is trained on the rear window. Under these circumstances, the Court finds that it was not unreasonable for the troopers to pull Ms. Trice over to briefly investigate further. *See also United States v. Foster*, 65 Fed. App'x. 41, 44 (6th Cir. 2003) ( "[T]he lack of a specific provision in the Kentucky code dealing with temporary license tags does not necessarily imply that they need not also be illuminated at night. More logically, the absence of a provision exempting temporary tags from the general applicability

10

of K.R.S. § 186.170(1) supports the proposition that they are subject to the same illumination requirements as are permanent plates").

Defendant cites *United States v. Wilson*, 205 F.3d 720, 724 (4th Cir. 2000), which held that the Fourth Amendment does not allow a policeman to stop a car just because it has temporary tags. However, that case is distinguishable. In *Wilson*, the officer testified that he noticed that the vehicle he was following had a temporary North Carolina tag, but he could not read the expiration date listed on it. The officer admitted that he "never saw anything illegal about the tag or the operation of the car." *Id.* at 722. The officer then pulled the vehicle over "[s]olely because he could not read the handwritten expiration date 'in the bottom little corner of the paper tag….'" *Id.* In this case, by contrast, both troopers testified that they could not see *any* license plate on the car they were following until after they initiated the car stop and illuminated the rear of the car with their spot light.

The Court finds this case more analogous to *United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008), a published decision from the Sixth Circuit that is binding on this Court. In *Simpson*, a police officer in Tennessee pulled over a driver with an illegible temporary Ohio paper license plate. The plate in question was "faded, weathered, torn, and otherwise deteriorated." *Id.* at 544. This constituted a potential violation of Tennessee law, which requires license plates to be "clearly legible." The Sixth Circuit held that:

> Under these circumstances, a temporary investigative stop was reasonable under the Fourth Amendment. Once [the officer] approached the vehicle to explain the reason for the stop—something that is surely permissible even if

11

the officer, after executing the stop, had concluded that there was no violation of law—he immediately developed further reasonable suspicion (the odor of marijuana) to detain the vehicle.

*Id*. at 543. This is quite similar to what occurred in this case. Here, Ms. Trice was not pulled over, as in *Wilson*, simply for having temporary tags. Rather, she was pulled over for two reasons, both for not wearing her seatbelt, *and* because the troopers could not see *any* license plate on her vehicle. A different result might be warranted if the officers testified that they observed a valid temporary plate before they pulled her over (as happened in *Wilson, supra*) and if this was the only reason they had for stopping her. But here the troopers stated that one of the reasons they initiated a traffic stop was because they saw no plates (temporary or permanent) on the car. After pulling Ms. Trice over, she almost immediately admitted to possessing marijuana, which permitted the troopers to detain the vehicle and investigate further.

Finally, another Judge of this Court also recently upheld the validity of a traffic stop because of a non-functioning license plate light, even though the defendant had a temporary registration plate affixed to the rear window. *See United States v. Wright*, No. 15-20302, 2016 WL 1069007 at *3 (E.D. Mich. Mar. 18, 2016) (Parker, J.). In *Wright,* the Court explained:

> Defendant provides no Michigan case law in support of his assertion that a non-functioning license plate light does not provide a legal justification for a stop so long as there is a valid temporary license plate in the rear window. The statute clearly indicates that the lamp illuminating the rear registration plate "shall be wired as to be lighted." The statutory language is not vague, nor does it suggest or imply that the illumination requirement is optional when there is a license plate located elsewhere on the vehicle. The statute solely requires functionality.

The decision in *Wright* is not squarely analogous to this case, because the infractions here were the failure to wear a seat belt and the suspected driving with no license plate, not for driving with a non-functioning license plate light. Here, the troopers had reason to believe that the driver violated Mich. Comp. Law § 257.686(2). The vehicle Ms. Trice operated did not have a registration plate visible from a distance of fifty feet to the rear. In addition to the seat belt violation discussed above, the troopers also had reasonable suspicion to conduct a traffic stop and investigate further whether there was a license plate infraction.

### C) The Gun Was Seized Lawfully

Although not specifically challenged by Defendant in his motion to suppress, having determined that the initial stop was valid, the Court will briefly address whether the troopers exceeded the scope of the stop since "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). The Sixth Circuit recently reiterated its long-standing position that "'the principles announced in *Terry v. Ohio*[, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] define the scope of reasonable police conduct' during traffic stops." *Everett*, 601 F.3d at 488 (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)).

Under *Terry*, a stop must be reasonably related in terms of scope and duration to the circumstances justifying the stop and "'last no longer than is

13

necessary to effectuate the purpose of the stop.'" *Id*. (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Nevertheless, a traffic stop may be extended if something occurs during the stop which generates reasonable suspicion "that criminal activity was afoot." *United States v. Torres–Ramos*, 536 F.3d 542, 550 (6th Cir. 2008).

Most traffic stops represent a minor inconvenience to the vehicle's occupants, *Knowles*, 525 U.S. at 117, 119 S.Ct. 484, but they "are 'especially fraught with danger to police officers,'" *Johnson*, 555 U.S. at 330, 129 S.Ct. 781 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). As a result, police officers may order drivers and passengers out of the automobile during the traffic stop without offending the Fourth Amendment. *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). However, while this interest in officer safety is "legitimate and weighty," *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), an officer may "perform a 'patdown' of a driver and any passengers [only] upon reasonable suspicion that they may be armed and dangerous." *Knowles*, 525 U.S. at 118, 119 S.Ct. 484 (citing *Terry*, 392 U.S. 1, 88 S.Ct. 1868).

"Reasonable suspicion is based on the totality of the circumstances," *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003) (citation omitted), and it exists if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger," *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. This standard is an objective one. *Id*. at 22, 88 S.Ct. 1868 ("If subjective

good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police." (internal quotation marks omitted)). Moreover, "[r]easonable suspicion 'requires more than a mere hunch....' " *Lyons*, 687 F.3d at 763 (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). It demands "a particularized and objective basis for suspecting [that] the particular person" is armed and dangerous. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (emphasis added); *see also Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the *Terry* exception [to the Fourth Amendment's warrant requirement] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked...."); *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007).

After considering the testimony offered during the evidentiary hearing, the Court finds that the troopers did not exceed the permissible scope of the initial stop by searching Defendant and by removing the firearm from his pants pocket. It is well established that safety concerns are an integral factor in the *Terry*-stop equation. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop ... and conducting pat-down searches upon reasonable suspicion that they may be armed and dangerous." *Bennett*, 410 F.3d at 822 (internal citations and quotation marks omitted). Moreover, "'the officer may ask the detainee a moderate number of questions to determine his identity and to try to

15

obtain information confirming or dispelling the officer's suspicions.'" *Butler*, 223 F.3d at 374 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). A court reviewing a suppression motion must determine whether a reasonably prudent person in the circumstances would be warranted in believing that his safety or that of others was in danger. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007). The Supreme Court has made clear that an officer must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect. *Cortez*, 449 U.S. at 417, 101 S.Ct. 690; *Ybarra*, 444 U.S. at 90–91, 100 S.Ct. 338; *United States v. Di Re*, 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

Here, the troopers testified at the suppression hearing that the situation spurred safety concerns in their minds for several reasons. Unquestionably, Trooper Hoffman had reason to suspect that Defendant could be armed, as he observed an empty pistol holster sitting at Defendant's feet. "Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Bradshaw*, 102 F.3d 204, 211

(6th Cir. 1996) (quoting *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)).

In this case, Trooper Hoffman observed an empty pistol holster on the passenger-side floorboard of the car, where Defendant was sitting. This gave rise to the reasonable suspicion that the pistol having once resided in that holster may well be secreted somewhere within the vehicle, or even within the immediate reach of the passenger. When Trooper Hoffman asked Defendant where he pistol was, he responded that it was indeed within reach, in his pants pocket. By the time of this admission, Ms. Trice had already informed the troopers that she had a "bag of weed" in the car, and the troopers could smell burnt marijuana. No one in the vehicle ever informed the troopers that they had a valid concealed pistol license that might have authorized them to possess a pistol inside the vehicle. Given these circumstances, it was entirely reasonable to seize the pistol from Defendant's pants pocket.

## CONCLUSION

For the reasons set forth above, Defendant's motion to suppress (Dkt. 13) is **DENIED**.

**SO ORDERED**.

s/Terrence G. Berg<br>
TERRENCE G. BERG<br>
UNITED STATES DISTRICT JUDGE

Dated: July 11, 2016

## Certificate of Service

  I hereby certify that this Order was electronically submitted on July 11, 2016, using the CM/ECF system, which will send notification to each party.

                <u>s/A. Chubb     </u>
                Case Manager